*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

THERESA LYNNE PETTO,

Defendant-Appellant.

UNPUBLISHED
February 4, 2020

No. 339997
Kalamazoo Circuit Court
LC No. 2015-000906-FC

Before: MARKEY, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

On the third day of her trial, defendant Theresa Petto pleaded guilty but mentally ill to felony murder. After she was sentenced to life without parole, Petto sought to withdraw her plea, contending that she was misled to believe that only by pleading guilty but mentally ill would she receive needed mental and physical healthcare in prison. The trial court conducted a *Ginther* hearing[1] and denied Petto's motion. We affirm.

I

The charges against Petto arose from the murder of Rachel Drafta. Drafta was shot in the back of the head as she walked down her driveway. Her neighbor saw someone fighting with Drafta, heard a gunshot, and saw Drafta fall. The neighbor saw the assailant walk from the scene. The police apprehended Petto, who fit the neighbor's description of the shooter, one block away. Petto stood in a driveway near a parked camper. In her drawstring bag the police found live rounds of ammunition, zip ties, duct tape, rubber gloves, trash bags, and a can of mace. A .22-caliber revolver registered to Petto, hidden under a rear tire of the camper, was subsequently identified as the murder weapon. Petto's Jeep was parked a short distance away. A machete, more garbage bags and zip ties, towels, kitchen knives, handwritten notes, and a small shovel were discovered inside the car. One of the notes sketched out a plan including: "9. Cuff

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

hands and feet. 10. Plastic over face [(so no fibers)]. 11. Pillow face. 12. Plastic bag over head [(tie tight)]. 13. Take cuffs off and take hair . . . ."

The prosecutor charged Petto with felony murder, MCL 750.316(b), attempted unlawful imprisonment, MCL 750. 349b(1)(a), and two counts of felony-firearm, MCL 750.227b. Before trial, Petto underwent a competency examination and was found competent to stand trial although mentally ill. The examiner recommended "continued psychiatric monitoring and treatment to promote optimal participation" in the proceedings.

On the third day of trial, Petto's counsel, attorney Jason Ronning, advised the court that Petto had decided to plead guilty but mentally ill to felony murder "under the condition of mental illness that the prosecutor would move to dismiss the remaining charges." Ronning further described the plea terms as follows: "She would receive a sentence for the felony murder, but still be able to receive psychiatric treatment with the Department of Corrections [MDOC]. That's my understanding of any sort of agreement."

The following colloquy with the court ensued:

> *Court*: Ms. Petto, the court has been advised of your intention to enter a guilty plea, but mentally ill. That means that you would be admitting to the violation as set for [sic] in the complaint, but that you would indicate that as part of that plea that you were mentally ill, and therefore [in] need of treatment. You understand that?
>
> *Defendant*: So, I can't get treatment otherwise?
>
> *Court*: In the process of these proceedings, no. That would be the . . . only source of that.
>
> *Defendant*: I understand.
>
> *Court*: Okay.
>
> You understand that the penalty with regard, it's not really a penalty, but basically the course of conduct that the system has for responding to that plea would be that you would be in custody for the rest of your life, that you would in fact receive mental health treatment as part of that process to deal with the identified issues that you have. You understand that?
>
> *Defendant*: Yes, sir.

After acknowledging her understanding of the rights she would forego by pleading guilty and verifying that she had not been threatened or promised anything "[b]esides what's been put forth by the parties in this matter," Petto unexpectedly pleaded "not guilty" to the charges as recited by the court. The trial continued.

Later that same day, Petto successfully entered a plea of guilty but mentally ill. The court explained the plea to Petto as follows:

-2-

A plea of guilty but mentally ill means that you can be found guilty with regard . . . to the crime that's alleged, but because of your situation the part of the sentence would have to be that you would receive treatment over the course of your time of incarceration. That is [in] essence the only real promise anybody can make with regard to this matter.

The court inquired, "Aside from that has anyone promised you anything else to get you to enter a plea?" Petto replied, "No, sir."

After being sentenced to imprisonment for life without parole, Petto unsuccessfully sought to withdraw her plea. She then filed a delayed application for leave to appeal. She contended that Ronning had provided ineffective assistance by advising her that "the only way" she would receive treatment for her physical and mental illnesses "would be to be 'tagged' mentally ill by the court, and the only way to be 'tagged' mentally ill by the court would be to plead guilty but mentally ill." During her incarceration, Petto asserted, she learned that "100% of the prisoners in the MDOC have access to mental and physical health treatment," and that being "tagged" as mentally ill by the court provides no greater access to treatment. Therefore, Petto argued, her plea was illusory and involuntary.

A panel of this Court denied Petto's application, with Judge Ronayne Krause dissenting. In lieu of granting leave to appeal, the Supreme Court remanded the case to this Court for consideration as on leave granted. *People v Petto*, 502 Mich 900; 913 NW2d 307 (2018). At Petto's request, we remanded the matter to the trial court for a *Ginther* hearing.

II

The testimony at the *Ginther* hearing centered on the information Ronning related to Petto regarding the benefits of pleading guilty but mentally ill. Ronning admitted that he told Petto that a plea of guilty but mentally ill would afford her an opportunity for materially different mental health treatment than would be available if she was convicted of felony murder without the guilty but mentally ill finding. Ronning testified:

I told her that if she were to plead guilty but mentally ill, she would receive a different level of psychological treatment than she would have had if she did not plead guilty but mentally ill and [was] convicted as charged. I told her that her chances of being treated differently and residing possibly in a psychiatric hold in the hospital or in the prison, as opposed to general population. If she wanted to have any control over the rest of her life, she needed to consider doing that.

Ronning claimed that before recommending the plea to Petto, he called the MDOC and asked questions about the "programs" and the treatment available for a prisoner who had pleaded guilty but mentally ill. Ronning also reviewed relevant MDOC policy directives. He concluded that there were "different procedures" for prisoners who entered the prison with a "tag" of guilty but mentally ill:

The intake for somebody without that tag is a mental health screening. The intake with the tag is a comprehensive psychological evaluation. It was my belief that if she had a comprehensive psychological evaluation she'd be far more likely to receive the appropriate treatment than she would had she just had a simple mental screening. That's based on 18 or so years of seeing people going to prison and not get treated appropriately for various reasons. I simply didn't have faith that they would treat her appropriately.

Petto testified that Ronning had "guarantee[d]" that she would "get all my medications that I need for my physical ailments and my mental needs" if she pleaded guilty but mentally ill, and that there was "no guarantee" she would receive her medications absent the plea. She averred:

> He . . . said if I was found guilty but not mentally ill there was no guarantee that I would get my medications. But, if I took the plea then I would be guarantee[d] those medications and mental health treatment.

Additionally, Petto asserted, Ronning told her that if she "did take the plea that I would go to the mental health unit at the prison." As a prisoner, Petto explained, she now knows that "[a]ll inmates get the same equal treatment" for physical and mental health, and that there is no "long-term" psychiatric wing or ward at the prison.

The trial court issued a written opinion finding that Petto's plea was voluntarily made. Despite Petto's testimony that Ronning had pressured her to enter into the plea, during the colloquy "she affirmed to the Court, on record, that her plea was voluntary and that she understood she could not come back at a later time to claim otherwise." Additionally, the court observed, Petto had "affirmed, on record, that there was no pressure from her attorney to enter the plea." And at the *Ginther* hearing, Petto "acknowledged that she was telling the truth when she entered her plea that it was voluntarily made."

The court next found that Petto had not been promised anything in exchange for her plea:

> Defendant contends that she was promised by Mr. Ronning that she would go to a mental health unit within the prison instead of general population if she pled guilty but mentally ill. However, this was never put on record. When Defendant entered her plea, the Court asked if she was promised anything by anyone to enter this plea besides the promise of treatment over the course of her incarceration. Defendant replied that she was not promised anything. Further, Defendant signed the Advice of Rights form which informed Defendant that she was giving up any claim that her plea resulted from promises not disclosed to the Court.

Finally, the court determined that Ronning had not performed ineffectively. At the *Ginther* hearing, the court recounted, Petto "clarified that Mr. Ronning told her there was no guarantee she would get mental health treatment without a plea of guilty but mentally ill; not that she would *not* get treatment unless she plead[ed] guilty but mentally ill." (Emphasis in original.) The trial court credited Ronning's testimony that he "never promised that [Petto] would not be placed in general population in prison or that her mental health treatment depended on her being

-4-

tagged as mentally ill; he stated he only told her being tagged as mentally ill would increase the probability of access to those things."

The trial court also addressed Petto's claim that she had relied on inaccurate information supplied by the trial court during this portion of the plea colloquy:

> *Defendant.* So, I can't get treatment otherwise?
>
> *Court.* In the process of these proceedings, no. That would be the only— only source of that.

The trial court explained:

> [W]hat [it] meant . . . was that, in the course of these proceedings; a pre-conviction status; the prospect of the Court imposing the requirement of mental health treatment was only available at the time of an entry of a plea as it would not have a say otherwise had the trial continued and Defendant was found guilty."

Petto now appeals, arguing that the trial court erred by finding her plea voluntary and that she received ineffective assistance from Ronning.

III

We review a trial court's decision on a motion to withdraw a plea for an abuse of discretion. *People v Cole*, 491 Mich 325, 329; 817 NW2d 497 (2012). Our review of whether a trial court has properly interpreted and applied constitutional and court rule requirements is de novo. *Id.* at 330.

MCR 6.302 governs guilty pleas. The rule provides that a "court may not accept a plea of guilty or nolo contendere unless it is convinced that the plea is understanding, voluntary, and accurate." MCR 6.302(A). Subrule (C) sets out the requirements for "A Voluntary Plea." If the prosecutor and defense counsel have entered into a plea agreement, "the agreement must be stated on the record or reduced to writing and signed by the parties." MCR 6.302(C)(1). The attorneys and the defendant must confirm the terms of the agreement. MCR 6.302(C)(2). The Court must additionally ask the defendant:

> (a) (if there is no plea agreement) whether anyone has promised the defendant anything, or (if there is a plea agreement) whether anyone has promised anything beyond what is in the plea agreement;
>
> (b) whether anyone has threatened the defendant; and
>
> (c) whether it is the defendant's own choice to plead guilty. [MCR 6.302(C)(4).]

The record reflects that the trial court complied with the court rule in all respects.

Because a guilty plea is a waiver of important constitutional rights, we must also consider whether a plea represents "a voluntary and intelligent choice among the alternative courses of

action open to the defendant." *North Carolina v Alford*, 400 US 25, 31; 91 S Ct 160; 27 L Ed 2d 162 (1970). In evaluating the voluntariness of Petto's plea, we consider "all of the relevant circumstances surrounding it." *Brady v United States*, 397 US 742, 749; 90 S Ct 1463; 25 L Ed 2d 747 (1970).

Petto contends that her guilty but mentally ill plea was induced by an illusory promise that she would receive special mental health treatment during her life-in-prison sentence, rendering the plea involuntary. Ronning admitted at the *Ginther* hearing that he had informed Petto that she would receive "a different level of psychological treatment" by pleading guilty by mentally ill than she would if convicted of felony murder. Petto claims that the information Ronning imparted equated to a guarantee of special psychiatric care, had no basis in legal or practical reality, and that this promise overcame her free will.

Our resolution of Petto's argument is governed by *People v Booth*, 414 Mich 343, 363-364; 324 NW2d 741 (1982). In *Booth*, the defendant asserted "that his plea was involuntary because it was entered into with an exaggerated belief in the benefits [psychiatric treatment] to be derived from pleading guilty but mentally ill." *Id*. at 363. The Supreme Court rejected the "assertion that because psychiatric treatment has not been forthcoming (as defendants contend in this case), their pleas of guilty but mentally ill were premised upon an illusory bargain and therefore were involuntary." *Id*. The Court continued, "A naked allegation of non-treatment or inadequate treatment after sentencing will not serve to invalidate an otherwise valid plea of guilty but mentally ill, although non-treatment may possibly provide a basis for an action by defendants against those departments which have not fulfilled the statutory mandate of treatment as psychiatrically indicated." *Id*. at 363-364.[2]

Unlike the defendant in *Booth*, Petto *is* receiving psychiatric care. Although she claims that she was promised that her care would differ from that received by the general population, she has presented no evidence that the care she receives is deficient, or fails to meet her needs. Furthermore, Petto admitted during the plea colloquy that she had been promised nothing more than "treatment over the course of . . . incarceration":

> *The Court*. Besides what's been put forth in terms of—well, I will say— say it—reiterate it again.
>
> A plea of guilty but mentally ill means that you can be found guilty with regard . . . to the crime that's alleged, but because of your situation the part of the sentence would have to be that you would receive treatment over the course of your time in incarceration. That is [in] essence the only real promise anybody can make with regard to this matter.

---

[2] The "statutory mandate" referenced by the Court, MCL 768.36(3), states in relevant part: "If the defendant is committed to the custody of the department of corrections, the defendant shall undergo further evaluation and be given such treatment as is psychiatrically indicated for his or her mental illness or intellectual disability."

-6-

Aside from that has anyone promised you anything else to get you to enter a plea?

*Defendant:* No, Sir.

*The Court*: And, this is voluntary on your part?

*Defendant*: Yes, Sir.

*The Court*: You understand if later on you want to come back and say this was not a voluntary plea this is being recorded and so the tape of this particular proceeding can be used to support the fact that your plea is voluntary at this time. You understand that?

*Defendant*: Yes, Sir.

We acknowledge that during the aborted plea, the trial court's answer to Petto's query regarding her ability to obtain mental health treatment in prison was clumsily worded at best, and misleading at worst. But Petto did not enter her plea after that colloquy. Rather, the trial continued and Petto was afforded further time for reflection, consideration, and consultation with Ronning. She then affirmed that the decision to enter the plea was hers and that no promises had been made other than that she would receive some mental health treatment in prison. Under the totality of the circumstances, the trial court did not abuse its discretion in determining that Petto's plea was voluntarily made.

IV

We turn to Petto's claim that she agreed to forego her right to complete her trial based on the constitutionally defective advice of her counsel.

"Whether a person has been denied effective assistance of counsel is a mixed question of and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). " '[I]t has long been recognized that the right to counsel is the right to the effective assistance of counsel.' " *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984), quoting *McMann v Richardson*, 397 US 759, 777 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970). In *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984), the United States Supreme Court held that a convicted defendant's claim of ineffective assistance includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." To establish the first component, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solomonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). With respect to the prejudice prong, the defendant must demonstrate a reasonable probability that but for counsel's errors the result of the proceedings would have differed. *Id*. at 663-664. In this guilty plea matter, Petto may satisfy the prejudice prong by establishing a reasonable probability that she would have rejected the plea offer and continued with the trial had she known important facts that counsel ineffectively failed to share. *Lee v United States*, __US __; 137 S Ct 1958, 1967; 198 L Ed 2d 476 (2017).

In the guilty plea setting, *Strickland*'s "effectiveness" prong focuses on "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v Lockhart*, 474 US 52, 56; 106 S Ct 366; 88 L Ed 2d 203 (1985) (quotation marks and citations omitted). Petto claims that Ronning erroneously informed her that she would receive special treatment for her mental and physical ailments if she pleaded guilty but mentally ill, and that she would not receive such treatment if she were convicted without the guilty but mentally ill "tag." Ronning's "guarantee" of better treatment and his threat that treatment would be denied absent the plea contravened professional norms, Petto insists.

We judge the reasonableness of Ronning's advice based on the specific facts and circumstances of the case, evaluated at the time Ronning served as counsel. *Strickland*, 466 US at 690. We are guided by the following admonitions:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [*Id*. at 689 (citations omitted).]

Ronning testified that after two days of trial, he believed that Petto was likely to be found guilty of felony murder. He summarized, "It's impossible to win a trial when the defendant writes exactly how they're going to do it, and then they do exactly what they say they're going to do." This seems to us a reasonable calculation, particularly given the armamentarium found on Petto's person and in her car. Before discussing a guilty but mentally ill plea with Petto, Ronning reviewed MCL 768.36(3), which *mandates* "psychiatrically indicated" treatment, called the MDOC to gather additional information, and consulted MDOC policy directives. Those directives verify that prisoners convicted of being guilty but mentally ill do, in fact, receive a different level of care when admitted to the prison. Prisoners committed to the MDOC without the "guilty but mentally ill" designation receive a "mental health assessment" by a "qualified health professional," a term that encompasses physicians, nurse practitioners, social workers, and registered nurses. Michigan Department of Corrections, *Health Services*, PD 03.04.100 (October 1, 2018), pp 1, 4. In contrast, prisoners entering the DOC as guilty but mentally ill "shall be given a comprehensive psychiatric examination within 10 working days after arriving at a reception center," and "shall not be medically cleared for transfer from a reception center until the psychiatric evaluation has been completed." Michigan Department of Corrections, *Psychiatric Evaluation of Prisoners Committed As Guilty But Mentally Ill (GBMI)*, PD 04.06.180A (June 1, 1990), p 1. The MDOC policy guidelines describe in detail the information that must be collected during the psychiatric evaluation, *id*. at 1-4; there is no policy corollary for other prisoners. Furthermore, the policy states under the heading "recommendations" the

following options: "For inpatient acute or chronic care, intermediate care unit, protected environment, or outpatient mental health team; referral to Psychological Services; routine institutional programming, etc." *Id*. at 3.

Ronning's testimony demonstrates that he considered carefully the likely result of Petto's trial, and conducted research into an avenue that might provide her with a benefit she would not receive in the event of her likely conviction as charged. Ronning's strategic choice to recommend a plea of guilty but mentally ill was made after investigation and appears sound. That Petto's actual mental and physical health treatment is not to her liking, or mirrors the treatment available to prisoners who have not been found guilty but mentally ill, does not mean that Ronning proceeded in a constitutionally ineffective fashion. To the contrary, under the circumstances the record reflects an objectively reasonable performance on Ronning's part.

We affirm.

/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly